THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | 3:21-CR-353 |
| v. | : | (JUDGE MARIANI) |
| | : | |
| JOHN VINCENT WATSON, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant John Vincent Watson's "Motion to Suppress

Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution"

(Doc. 24.)  Defendant is charged with five counts of sexual exploitation of a minor in

violation of 18 U.S.C. § 2251(a).  (*See generally* Doc. 1.)  The present Motion seeks to

suppress all primary and derivative evidence obtained from Defendant's cell phone.  (Doc.

24 at 3.)

The Court held a Suppression Hearing on August 16, 2022, at which the

Government presented four witnesses.  At the close of the Hearing, both parties requested

time to file supplemental briefs that addressed the issue of whether law enforcement seized

Defendant's cell phone in accordance with the Fourth Amendment.  This Court granted the

request.  (Doc. 34 at 57-59.)  The parties have filed their post-hearing documents (Doc. 38;

Doc. 39) and this matter is now ripe for disposition.  For the reasons discussed below, the

Court will deny Defendant's Motion to Suppress.

## II. FACTUAL BACKGROUND

At approximately 9:35 a.m. on October 25, 2021, the Plains Township Police Department was dispatched to the Red Roof Inn in Plains, Pennsylvania in response to a 911 call from a 14-year-old female ("victim") who reported that she had been kidnapped on Friday October 22, 2021.  (911 Call Recording Gov. Ex. A; 911 Dispatch Sheet, Gov. Ex. B.) The victim provided many details about her alleged kidnapper while on the phone with 911, including a physical description of the alleged kidnapper, the model and color of his car, and his license plate number.  (*Id.*)  The victim said she had been repeatedly sexually assaulted and taken to multiple locations.  (*Id.*)  After police arrived at the victim's hotel room at the Red Roof Inn, the 911 call ended.  (*Id.*)

Responding police officers did not hear the actual 911 call made by the victim. (Hr'g Tr., Doc. 34 at 14.)  Instead, officers received information from a dispatcher, who relayed important information from the 911 call to officers, and the officers also had access to a written 911 dispatch sheet that provided information in real time.  (*Id.* at 19.)[1]

---

[1] Detective Lewis, an officer who responded to the Red Roof Inn, explained the 911 dispatch sheet:

Q. So [the dispatch sheet] is what comes across as the dispatch to law enforcement?

A. Yes, it's very similar to this.  Like I said, it's in real time.  You can actually read this.

Q. If you wanted to you can read it and you can listen, but it's transcribed in real time?

A. Correct.

(Doc. 34 at 19).

Chief Dale Binker, Detective Daniel Lewis, Detective Timothy Minnick, and Lieutenant Lussi, all with the Plains Townships Police Department, responded to the Red Roof Inn. (*Id.* at 7.) When the officers arrived, the victim was shaking, unable to look the officers in the eye, and "[s]he was extremely just very uncomfortable." (*Id.* at 8.) After "mak[ing] sure she was safe, alone and medically okay," Detective Lewis conducted a minimal facts interview with the victim and determined that what she told 911 matched what she said during the interview. (*Id.*) The victim was then reunited with her family and given medical assistance, and a "full interview" was set up with a forensic interviewer at the Children's Advocacy Center in Wilkes-Barre, Pennsylvania. (Doc. 34 at 8-9.)

After the victim made the 911 call, Luzerne County issued a "Be On the Lookout" ("BOLO") alert. At the Suppression Hearing, the BOLO alert information was provided by Sergeant Samuel Blaski from the Kingston Police Department who heard the BOLO alert and apprehended Defendant. He said the alert contained the following information: "They asked that a motel in Plains, that there was a female there that stated she was abducted, and they put out a be on the lookout for an older model Volvo. They gave a registration['] plate, description of the male driver. They said his name, license plate number, where it was heading towards Luzerne Pennsylvania." (Doc. 34 at 26.) The alert described the driver as black male named John Watson who had a beard dyed blond. (*Id.* at 26-27.) Although Sergeant Blaski testified that the BOLO alert contained information about an

alleged abduction, Sergeant Blaski later testified that he "didn't know what they needed him for." (Doc. 34 at 34, 36.)

At the Suppression Hearing, Sergeant Blaski said that he heard the BOLO alert and identified a vehicle that matched the description of the car in the alert. (*Id.* at 28-29 ("Yes, the person driving [the car] matched the description given, the car color, the car make, model, it was the same. The license plate was very, very, very close.").) The car matching the description was parked in front of a daycare center and Sergeant Blaski approached the driver, who is the Defendant in this case. (*Id.* at 28.)

Sergeant Blaski observed a cell phone in Defendant's hand and he was "actively on it" talking to someone as he approached the vehicle. (*Id.* at 29, 34.) Defendant hung up his phone, and then Sergeant Blaski asked Defendant for his identification, which matched the name included in the BOLO. (*Id.*) Sergeant Blaski then asked Defendant to step out of his vehicle, which he did willingly. (*Id.* at 29-30.) Sergeant Blaski testified that when Defendant got out of his car:

> [h]e had his cell phone on him in his hand, and he already handed me his wallet. I had his wallet. When he came out of the car, I said, okay, you want to turn around. I said I am going to place handcuffs on you because I am going to detain you at that time. I said, you're not under arrest, but I said there's an agency looking to speak to you. I said, for your protection as well as mine, I'm going to place you in handcuffs so put the cell phone on the roof of the car. I said, I [put] your wallet up there. I reached in and grabbed the key from the ignition and turned the car off and put the keys on the roof of the car and placed him in handcuffs.

(Doc. 34 at 30.)  Sergeant Blaski then placed Defendant in the back of his patrol car, which

was equipped with a transport cage, and he placed Defendant's keys, wallet, and cell phone

on the front passenger seat of his patrol car.  (*Id.* at 30, 32.)

On cross examination, Sergeant Blaski was asked about retrieving the items from

the top of the car and he responded that he retrieved the wallet, phone and keys while he

was waiting for other officers to arrive at the scene where he had apprehended Defendant

pursuant to the BOLO alert:

> Q. Was it at that point you went – after you got off the radio, you went and
> retrieved the items from the top of his Volvo?
>
> A. Yes, yeah, right.  Yes.  So I radioed, told them what was going on.  I then
> got out of the car, got his wallet, his keys and the cell phone and placed them
> on my passenger seat of my cruiser.
>
> Q. That was for the purpose of giving them back to him?
>
> A. It's his property.
>
> Q. Right.  And he was not under arrest.  I mean, assume he was entitled to
> hold his property, no?
>
> A. Sure.  He never asked though.
>
> Q. You transported him with his property to the police station?
>
> A. Plains Township police station.
>
> Q. Did you ever offer to give him his property back?
>
> A. He asked me in the car about the welfare of his child. I said, we can work on
> that. I said, where is your child at. He said Luzerne. He said he's with the baby's
> mother. I said, do you have her information in your phone. He said yes. I said,

okay, we will get that from your phone when we get back to Plains, you can call
or whatever you need to do when we get to Plains. It's the only reference he
had about his property I guess.

(Doc. 34 at 37-38.)

After apprehending Defendant, Sergeant Blaski "notified Luzerne County dispatch to

contact Plains Township Police Department to advise them we did stop the car, we do have

the individual, what would they like done." (*Id.* at 30-31.)  Soon thereafter, multiple

additional units, including two Plains Township Police Department detectives and one

detective with the Luzerne County District Attorney's Office, arrived at the scene.  (*Id.* at 31.)

Upon request of the Plains Township Police Department, Sergeant Blaski

transported Defendant to the police station with his cell phone and wallet.[2]  (*Id.* at 32, 38.)

He testified that, prior to transport, Defendant was in the back of the car for approximately

fifteen to twenty minutes.  (Doc. 34 at 36.)

On direct examination, Sergeant Blaski was asked about what happened when he

got to Plains Township Police Department:

Q. And what happened once you arrived at the Plains Township Police
Department?

A. I arrived. I then asked Mr. Watson get out of the car. I grabbed his property.
We walked in the back door of the Plains Township Police Department. They
asked me if I can take him upstairs to, I guess, their interview room. So I walked
him upstairs. We went immediately into a room that had a table. I took the cuffs
off    him,    and    I    sat    him    down.    They    asked    if    I

_____

[2] Sergeant Blaski left Defendant's car keys with another officer because he believed that the car
was going to be towed. (Doc. 34 at 32.)  He gave no specific basis for this belief but indicated later in his
testimony that he had no charges on Defendant "besides driving under suspension."  (*Id*. at 36.)

can wait with him until they got prepared for their interviews or whatever they were going to do. I said okay.

Q. What did you do the personal property that you had with you, his wallet and his cell phone?

A. They were still with me and him, so I left -- I put them on the table that was there in the interview room. And once Plains came up to do their interview or whatever, they were left with them.

Q. Then did you leave after that?

A. Yes, I did. They told me I was done.

(Doc. 34 at 32-33.)  On cross-examination, Sergeant Blaski confirmed that the phone was still in the room with Defendant when he left.  (Doc. 34 at 39.)  Chief Binker's recollection differed in that he testified that Sergeant Blaski "turned over a cell phone to me" before the interview took place. (*Id.* at 45.)  Chief Binker further testified that, after he took the cell phone from Sergeant Blaski, he gave it to Detective Lewis, the Department's cell phone technician, whom he believed secured the phone.  (*Id.* at 47.)

Detective Minnick of the Plains Township Police Department and Detective Ballow of the Luzerne County District Attorney's office interviewed Defendant.  (*Id.* at 45.)  Chief Binker observed part of the interview from a remote location.  (*Id.* at 50.)  During the interview, Chief Binker was still making calls with Mike Dessoye, the chief county detective, and others involved in the case.  (*Id*.)   At the end of the interview, the Luzerne County District Attorney decided not to file charges against Defendant; instead, the District Attorney decided to release Defendant.  (*Id.* at 45.)  Thus, Defendant was released from police

7

custody without ever having been placed under arrest on October 25, 2021.  Chief Binker

explained that he was required to get authority from the District Attorney's office before filing

charges in this case because it was a sexual case.  (*Id*.)

Chief Binker was asked about what happened to Defendant's cell phone when

Defendant was released and he testified as follows:

Q. And when Mr. Watson was released, did you give him his cell phone back?

A. No.

Q. Why?

A. He didn't ask for it, and I was keeping it as evidence.

Q. Why did you think it was important to keep for evidentiary purposes?

A. Because knowing – I'm not – knowing what I know – I know about cell
phones.  They could be used in a commission of a crime where photographs,
due their conversations he might have reached unite [sic] to somebody on that
cell phone, and from what we learned from that 911 call that the cell phone
was a key part of this.  Although we didn't file charges that day, I was advised
after the interview with our victim there would be charges filed promptly.

(Doc. 34 at 45-46.)  On cross examination, Chief Binker was asked about his interaction

with Defendant and the cell phone:

Q. Did you interact with Mr. Watson at all?

A. At the end.

Q. At the end meaning when he was released?

A. Yes.

Q. What was the nature of those interactions?

A. At first when I advised him -- after I got the phone call from the district attorney saying to release him, myself and officer Walsh were in the room, and I first told him that he's going to be released, and he replied to me -- he said, as soon as I walk out of that room -- and he pointed to officer Walsh -- and said, he's going to arrest me. I said, no, as a matter of fact, my officer will give you a ride wherever you want to go. He dropped down to his knees, and he said, thank you. He got up and followed officer Walsh out to the police car and went out [sic] the building.

Q. Did you talk to him about the cell phone at all?

A. No.

Q. Did you have any information about the cell phone other than it had been given to you?

A. No.

Q. Did anyone tell you about the circumstances under which the cell phone was seized or whether Mr. Watson had said anything about it to them or anything of that nature?

A. No, I didn't have a conversation with sergeant Blaski. He gave – he handed me – he said, here's the cell phone. At that point detective Lewis – it was – eventually it was turned over to him and I didn't know anything else, where the cell phone was located or how they got it.

Q. Did you – at the time you decided to hold the cell phone you said because you believed it might be evidence, had you spoken with Lewis or Minnick or Lussi about the case to come to that conclusion?

A. No, I came to – by myself being a police officer for 25 years knowing that a 40-some-year-old male was in a hotel room with a 14-year-old-girl I can – she's claiming she had relations with the gentleman, at that point I can conclude that there will be charges filed because anybody over 18 shouldn't have sex with a minor.

Q. Understood. But no specific information about the cell phone's involvement in this?

A. I know from my training that cell phones, you have text messages, phone conversations, G.P.S. locations, and I know that some people that's all they communicate on to – I still have a house phone.  Maybe Mr. Watson didn't.  So a cell phone could be destroyed very easily if it was returned to him.

(*Id.* at 48-49.)

On October 26, 2021, the day after the victim made the 911 call, Detective Timothy

Minnick of the Plains Township Police Department applied for and obtained a warrant to

search Defendant's cell phone which they had seized on October 25, 2021. (Doc. 28 at 3;

Search Warrant, Doc. 24-4 Def. Ex. A.)   Detective Minnich applied for the Search Warrant

and completed the Affidavit of Probable Cause.  (*Id.*)   The subject of the Search Warrant

was a "black Iphone with a [sic] Eiffel Tower case" which was in the Plains Township Police

Department Evidence #21-0000371.  (Doc. 24-4 at 1.)  The "Identify Items to be Searched

and Seized" section of the Search Warrant listed the following:

1. Any telephone numbers, contact lists, friend lists, messages (verbal or text) including content and all information related to and/or contained within the devices' memory, including contact lists, recently placed or received telephone calls, chats and text messages (present and deleted) and any other part of the electronic memory of the devices.

2. Any and all contents contained within the device's internal storage or connected memory card (SD Card), information contained in other memory or storage locations within the device, photographs, any other electronic communications, installed programs/applications and their data and location information. This includes applications on the device that utilize GPS and mapping data.

3. All user generated data stored on the handset, SIM card, and/or Micros SD card including user information, application information and data, image files, video files, websites visited, searched items, all call logs (incoming, outgoing,

and missed), contact lists and/or phonebooks, Short Message all Services/Text Messages (SMS), Multimedia Messaging Services (MMS).

(Doc. 24-4 at 1, 5.)

The search of Defendant's cell phone revealed sexually explicit videos that allegedly depict the victim.  (Doc. 28 at 4.)

On November 9, 2021, Defendant was indicted on five counts of sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a).  (*See generally* Doc. 1).  A warrant was issued and U.S. Marshals located Defendant living on a train in Cleveland, Ohio. [3] (Doc. 28 at 4.)  On January 18, 2022, Magistrate Judge Karoline Mehalchick arraigned Defendant and he is currently detained.  (*Id.*)

### III. ANALYSIS

### A. Cell Phone Seizure

In his pending Motion (Doc. 24) Defendant requested an Evidentiary Hearing to determine if the Government could "shoulder its burden" regarding warrantless searches

---

[3] State court records indicate that a Criminal Complaint was filed against Defendant in Luzerne County on October 28, 2021, under Magisterial District Criminal Docket Number MJ-11308-CR-0000177-2021 with a listed offense date of October 22, 2021, for Statutory Sexual Assault: 11 years older; IDSI Person Less than 16 Yrs Age; Rape Forcible Complusion; Sexual Assault; False Imprisonment of Minor/Not Parent; Corruption of Minors – Defndant Age 18 or Above; Indecent Exposure; Terroristic Threats W/Int to Terrorize Another; and Indecent Assulat Person Less than 16 Yrs Age. *See* https://ujsportal.pacourts.us/CaseSearch.  After the Criminal Complaint was filed on October 28, 2021, the next identified activity is the scheduling of a Preliminary Arraignment on January 11, 2022.  These charges are now set for trial on November 14, 2022, in the Luzerne County Court of Common Pleas under Criminal Docket Number CP-40-0002034-2022. *Id.*  Another Criminal Complaint was filed October 29, 2021, under Magisterial District Judge Criminal Docket Number MJ-11308-CR-0000210-2021 for Theft by Unlawful Taking and Receiving Stolen Property, offense date October 27, 2021.  *See* https://ujsportal.pacourts.us/CaseSearch.  This case also appears to be active. *Id.*

and seizures.  (Doc. 24 ¶ 5.)  In his supporting brief, Defendant generally averred that the

searches and seizures in this case

> suggest the possibility that Watson's Fourth Amendment rights were violated
> by an arrest absent probable cause, an unlawful search incident to arrest (even
> assuming *arguendo* the legality of the arrest), an unlawful search incident to an
> investigative seizure, a vehicle search absent probable cause, a pretextual
> inventory search of the vehicle, or an unlawful detention of the phone.  *See*
> *generally Dunaway v. New York*, 442 U.S. 200 (1979); *Arizona v. Gant*, 556
> U.S. 332 (2009); *Terry v. Ohio*, 392 U.S. 1 (1968); *Carroll v. United States*, 267
> U.S. 132 (1925); *Colorado v. Bertine*, 479 U.S. 367 (1987); *Illinois v. McArthur*,
> 531 U.S. 326 (2001).

(Doc. 25 at 13-14.)

At the Evidentiary Hearing, the parties focused on the seizure of the cell phone.

(*See* Doc. 34.)  In his post-hearing brief, Defendant does the same, asserting that it is the

Government's burden to show the legality of the seizure of Defendant's phone and other

evidence obtained from him on October 25, 2021, and the Government has not met its

burden.  (Doc. 25 at 1.)   Therefore, the general averments regarding warrantless searches

and seizures previously asserted are now narrowed to the propriety of the seizure of

Defendant's cell phone with Defendant contending that "the Court should suppress all

primary and derivative evidence tainted by the government's illegal conduct" (Doc. 39 at

10).

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures ... and no Warrants shall
> issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (West 2002).  For Fourth Amendment purposes, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1985); *see also Horton v. California*, 496 U.S. 128, 133 (1990) ("A search compromises the individual interest in property; a seizure deprives the individual of dominion over his or her person or property.").

As stated in *Illinois v. McArthur*, 531 U.S. 326 (2001), the Fourth Amendment's "'central requirement' is one of reasonableness."  *Id.* at 330 (quoting *Texas v. Brown*, 460 U.S. 730, 739 (1983)).  *McArthur* further explained that

> [i]n order to enforce that requirement, this Court has interpreted the Amendment as establishing rules and presumptions designed to control conduct of law enforcement officers that may significantly intrude upon privacy interests. Sometimes those rules require warrants. We have said, for example, that in "the ordinary case," seizures of personal property are "unreasonable within the meaning of the Fourth Amendment," without more, "unless ... accomplished pursuant to a judicial warrant," issued by a neutral magistrate after finding probable cause. *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
>
> We nonetheless have made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. See, *e.g., Pennsylvania v. Labron,* 518 U.S. 938, 940–941, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) *(per curiam)* (search of automobile supported by probable cause); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412

(1990) (suspicionless stops at drunk driver checkpoint); *United States v. Place, supra,* at 706, 103 S.Ct. 2637 (temporary seizure of luggage based on reasonable suspicion); *Michigan v. Summers,* 452 U.S. 692, 702–705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (temporary detention of suspect without arrest warrant to prevent flight and protect officers while executing search warrant); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (temporary stop and limited search for weapons based on reasonable suspicion).

. . . [R]ather than employing a per se rule of reasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable. *Cf. Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (determining lawfulness by balancing privacy and law enforcement interests); *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (same).

531 U.S. at 330–31.

The practical result of finding that a search or seizure violates the Fourth Amendment is that, pursuant to the "exclusionary rule," "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra,* 414 U.S. 338, 347, (1974). This prohibition also applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348; *United States v. Leon,* 468 U.S. 897, 906 (1984). Importantly, the Supreme Court has continually stated that

the significant costs of this rule have led us to deem it "applicable only ... where its deterrence benefits outweigh its substantial social costs." *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (internal quotation marks omitted). "Suppression of evidence . . . has always been our

last resort, not our first impulse." *Ibid.*

*Utah v. Strieff*, 579 U.S. 232, 237–38 (2016).[4]

_____

[4] *Strieff* explains that

> [t]hree of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. See *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. See *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Third, and at issue here, is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson, supra,* at 593, 126 S.Ct. 2159.

579 U.S. at 238. Another well-recognized exception to the application of the exclusionary rule is the good faith exception which was developed to effectuate the balance of the deterrent value of suppression and the resulting social costs. *See, e.g., United States v. Katzin,* 769 F.3d 163, 171 (3d Cir. 2014). *Katzin* summarizes Supreme Court precedent on the good faith exception:

> Where the particular facts of a case indicate that law enforcement officers acted with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involve[d] only simple, 'isolated' negligence," there is no illicit conduct to deter. In such circumstances, the deterrence rationale loses much of its force and exclusion cannot pay its way. Alternatively, where law enforcement conduct is deliberate, reckless, or grossly negligent or involves recurring or systemic negligence, deterrence holds greater value and often outweighs the associated costs. Put differently, exclusion is appropriate only where law enforcement conduct is both sufficiently deliberate that deterrence is effective and sufficiently culpable that deterrence outweighs the costs of suppression. Thus, determining whether the good faith exception applies requires courts to answer the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.

769 F.3d at 171 (internal quotations, citations, and alterations omitted) (citing *Daivs v. United States,* 564 U.S. 229 (2011); *Herring v. United States,* 555 U.S. 135 (2009), *United States v. Leon,* 468 U.S. 897 (1984)).

As an initial matter, the parties disagree on when a seizure of the phone occurred. According to Defendant, "[t]he seizure of Mr. Watson's phone occurred no later than when Blaski directed Watson to place the phone on the roof of Watson's car, and after Watson did so, took Watson away from the phone (in cuffs) to sit in Blaski's police car." (Doc. 39 at 5.) The Government argues that "[n]o search or seizure of Watson's property was conducted by Sergeant Blaski at any time" and claims that "the actual seizure of the property occurred when Chief Binker made the decision to retain Watson's cell phone after Watson was released."[5] (Doc. 38 at 10.)

The Court will first consider whether Sergeant Blaski executed a seizure of Defendant's cell phone. At the outset of this analysis, the Court notes that Defendant does not argue that his seizure pursuant to the BOLO alert violates the Fourth Amendment nor does he contest the propriety of being handcuffed by Sergeant Blaski. (*See* Doc. 39.)

Sergeant Blaski testified that when Defendant exited his vehicle with his cell phone in hand and he told him he was going to handcuff him so he should put the phone on the roof of his car, Defendant did so. (Doc. 34 at 30.) After Defendant was seated in the backseat of the car "for temporary holding" (*id.*) while awaiting the arrival of other officers, Sergeant Blaski took Defendant's cell phone, wallet, and car keys from the roof of Defendant's car and placed them on the passenger seat of his police car. (*Id.* at 31-32.)

––––––––––––––––––––

[5] Detective Lewis's agreement that Defendant's phone had been seized by the time he was brought to the Plains Township Police Station (Doc. 34 at 11, 24) is of no legal significance in the Fourth Amendment seizure inquiry in that his testimony was simply that the phone had been seized without reference to the Fourth Amendment definition of that term. (*Id.*)

Upon the request of Plains Township Police Department officers to transport Defendant to the Plaints Township police station because he had "a caged car" (*id.* at 32), Sergeant Blaski transported Defendant and his property.  (*Id.* at 31-32, 35.)[6]  Although the testimony of Chief Binker differs somewhat from that of Sergeant Blaski as to precisely how Chief Binker came into possession of the cell phone, *see supra* p. 7, there is no disagreement that Sergeant Blaski brought the phone and wallet with him to the Plains Township Police Department and no evidence suggests that he expressed an intention or basis to retain possession of the phone for more than temporary holding at any time after he asked Defendant to place the phone on the roof of the car at the scene of the stop.

Because Sergeant Blaski's actions deprived Defendant of possession of his phone without consent, a seizure occurred.  The next question is whether the seizure was unreasonable and, therefore, a violation of Defendant's Fourth Amendment rights.[7]  As instructed in *McArthur*, "rather than employing a per se rule of reasonableness," the Court

---

[6] As stated above, Sergeant Blaski left Defendant's car keys with another officer because he was staying at the scene with Defendant's car.  (Doc. 34 at 32.)  Therefore the personal property retained by Sergeant Blaski consisted of Defendant's wallet and cell phone.

[7] As set out previously in the text, *see supra* pp. 4-5, Sergeant Blaski testified that he said to Defendant (who had the cell phone in his hand and had already been instructed to turn around) "for your protection as well as mine, I'm going to place you in handcuffs so put the cell on the roof of the car.  I said, I put your wallet up there too."  (Doc. 34 at 30.)  The fact that Defendant did so without question or comment cannot be deemed implied consent because he was not provided a choice and Defendant was submitting to authority when he placed the cell phone on the roof.  *See, e.g., Bumper v. California*, 391 U.S. 103, 106 (1968).

will "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." 531 U.S. at 331 (citations omitted).

In his testimony, Sergeant Blaski did not articulate that his seizure of the phone was based on reasonable suspicion, probable cause, or another specific exception to the warrant requirement set out in *McArthur*, *see* 531 U.S. at 330-31. *See supra* pp. 13-14. However, considered in the context of "special law enforcement needs, diminished expectations of privacy, [and] minimal intrusions," *id.* at 330, the bedrock Fourth Amendment principle of reasonableness in the circumstances, *id.* at 330-31, supports a conclusion that the initial seizure by Sergeant Blaski was reasonable under the Fourth Amendment. [8]

Sergeant Blaski acted in response to the special law enforcement needs of a BOLO alert which required him to temporarily hold Defendant based only on a 911 dispatch while

_____

[8]  Contrary to the Government's assertion, the "plain view" and "collective knowledge" doctrines do not apply here. (*See* Doc. 38 at 8-12.) The Court of Appeals has consistently held that the incriminating nature of items in plain view must be immediately apparent. *See United States v. Menon,* 24 F.3d 550, 559 (3d Cir.1994) (noting that under the plain view doctrine, "the incriminating nature of the evidence must be immediately apparent."); *United States v. Benish,* 5 F.3d 20, 25 (3d Cir.1993) ("[A] plain view seizure is justified only if the 'incriminatory character' of the item sought to be seized is 'immediately apparent' at the moment preceding  the seizure.")(internal quotes and citations omitted).  Here, the Government posits that this requirement is met based on the "collective knowledge doctrine which imputes the knowledge of one law enforcement officer involved in an investigation to the officer who actually conducted the seizure or arrest" and here the knowledge of "officers with more knowledge of the investigation ultimately determined that the cell phone was of evidentiary value."  (Doc. 38 at 11-12 (listing cases).)  Because the collective knowledge doctrine either requires that the collective knowledge be derived from officers on scene, *United States v. Menon,* 24 F.3d 550 (1994), or the seizure must occur at the direction of an officer with the requisite level of knowledge,  *United States v. Whitfield*, 634 F.3d 741 (3d Cir. 2010), and neither requirement is satisfied here, the plain view exception does not apply in this case.

awaiting further direction and/or the arrival of Plains Township officers who had further information about the basis for the 911 dispatch.

Having been told that he was detained because "another agency was looking to speak with [him]" (Doc. 34 at 30), Defendant had a diminished expectation of privacy. Based on Sergeant Blaski's testimony that he was open with Defendant about what was going on and radioed Plains Township Police Department officers with Defendant in the back of the car, Defendant knew that he was being temporarily held in the police car handcuffed behind his back awaiting the arrival of officers from the Plains Township Police Department because he and his car matched the descriptions in the 911 dispatch.[9] (*See* Doc. 30 at 30-32, 36.)

The intrusion was "minimal" because of the circumstances of his detention, including his inability to use a phone while handcuffed behind his back, and the limited duration of the temporary holding (waiting for other officers to arrive) which Sergeant Blaski estimated to be fifteen to twenty minutes. Because Sergeant Blaski was going to handcuff Defendant behind his back, the interference with Defendant's possession of his cell phone which he was holding was reasonable, and it was reasonable for Sergeant Blaski to put the phone on the front passenger seat of his police car during the temporary holding period rather than leave Defendant's phone on the roof of the car where Defendant had placed it. *See Hudson*

---

[9] Because Sergeant Blaski testified that he had Defendant turn around as soon as he got out of his car and Sergeant Blaski handcuffed him after he placed his cell phone on the roof of his car, *see supra* p.5, the Court assumes that Defendant was handcuffed behind his back.

*v. Palmer*, 468 U.S. 517, 538–39 (1984) (the court looks to whether the act of taking

possession was reasonable).  Although the duration was slightly extended because

Sergeant Blaski was asked to transport Defendant to the Plains Township Police

Department, the brief transport from the location of the stop to the nearby Police

Department does not alter the analysis because the practical considerations of the initial

seizure remain the same.[10]  Once at the Plains Township Police Department, Sergeant

Blaski accompanied Defendant to the interview room at the request of Department

personnel, at some point relinquished his possession of the phone,[11] and had no official role

thereafter.  *See supra* pp. 6-7.

Finally, balancing the privacy-related and law enforcement-related concerns to

determine if the intrusion was reasonable in this case, 531 U.S. at 331, the Court concludes

Sergeant Blaski's initial intrusion was reasonable.  For reasons stated above, the privacy-

related concerns of the intrusion are minimal given the unchallenged propriety of

Defendant's detention based on the BOLO alert, including being handcuffed following

apprehension.  The law enforcement related concerns weigh in favor of the reasonableness

of the seizure in that the seizure of the cell phone was occasioned by the practical realities

---

[10] According to Google Maps, the distance from Pizza Bella, which is adjacent to the daycare parking lot where Defendant was apprehended (*see* Doc. 34 at 28), to the Plains Township Police Department is 2.6 miles.

[11] Though Sergeant Blaski and Chief Binker have different recollections of how Sergeant Blaski relinquished possession, *see supra* p. 7, the discrepancy is not relevant to the present analysis.

of Defendant being handcuffed, an action that Defendant does not contest, and the

subsequent need to transport the phone with Defendant.  Thus, on the unique facts of this

case, the Court concludes that Sergeant Blaski's initial seizure of the phone was not

unreasonable and did not violate the Fourth Amendment.[12]  However, this does not end the

inquiry because the seizure was clearly extended by Chief Binker and his subsequent

possession of the phone.  Thus, the seizure became unreasonable based on Chief Binker's

extension of the initial seizure unless a recognized exception to the warrant requirement

applies.

In *United States v. Place, 462 U.S. 696 (1983),* the Supreme Court stated that

"[w]here law enforcement authorities have probable cause to believe that a container holds

---

[12] Sergeant Blaski's testimony supports a conclusion that his actions were consistent with his expressed intent that the detention of the phone would be of a limited duration and his recognition of Defendant's ongoing possessory interest in the phone though Defendant lacked actual possession of the phone during temporary holding.  At the Evidentiary Hearing, Sergeant Blaski confirmed that he took Defendant's keys, wallet, and phone from the roof of Defendant's car "for the purpose of giving them back to him," stating "[i]t's his property."  (Doc. 34 at 37.)  When asked if he ever offered to give Defendant his property back he responded that

> [h]e asked me in the car about the welfare of his child. I said, we can work on that. I said, where is your child at. He said Luzerne. He said he's with the baby's mother. I said, do you have her information in your phone. He said yes. I said, okay, we will get that from your phone when we get back to Plains, you can call or whatever you need to do when we get to Plains. It's the only reference he had about his property I guess.

(Doc. 34 at 37-38.)  This testimony and agreed upon facts, show that Sergeant Blaski did not exhibit or express an intent to interfere with Defendant's possessory interest in his wallet or his cell phone beyond the duration of his placement in the backseat "for temporary holding" (Doc. 34 at 30) while Sergeant Blaski awaited the arrival of Plains Township Police Department officers and granted the request to transport Defendant to Plains.

contraband or evidence of a crime, but have not secured a warrant," the "seizure of the

property, pending issuance of a warrant to examine its contents [is permitted], if

the exigencies of the circumstances demand it or some other recognized exception to the

warrant requirement is present." *Id.* at 701.  The application of this principle to cell phones

was recognized in *Riley v. California*, 573 U.S. 373 (2014).  Though *Riley* was decided in

the context of an arrest, Circuit Courts have concluded that seizure of a cell phone based

upon probable cause and exigent circumstances when the defendant had not been arrested

at the time of the seizure does not violate the Fourth Amendment.  *United States v.*

*Babcock*, 924 F.3d 1180 (11th Cir. 2019); *United States v. Burton*, 756 F. App'x 295 (4th Cir.

2018); *United States v. Mason*, No. 21-5384, 2021 WL 5647774 (6th Cir. 2021).

Relying on *McArthur*, *Burton* set out considerations relevant to the determination of

whether exigent circumstances justify a warrantless seizure in the telephone seizure at

issue.  *Burton*, 756 F. App'x at 298-99; *McArthur*, 531 U.S. at 331-33.  A court is to

determine whether

> (1) the police had probable cause to believe that the item seized contained
> contraband or evidence of a crime; (2) the police had good reason to fear that,
> absent such seizure, the defendant would destroy material evidence before the
> officers could obtain a warrant; and (3) the police made reasonable efforts to
> reconcile their law enforcement needs with the demands of personal privacy.

*Id.* (internal quotation marks omitted).  *McArthur* also looked at whether "the time period was

no longer than reasonably necessary for the police, acting with diligence, to obtain the

warrant."  531 U.S. at 332 (citations omitted).  As the Supreme Court stated in *Kaley v.*

*United States*, 571 U.S. 320 (2014), "[p]robable cause . . . is not a high bar: It requires only the kind of fair probability on which 'reasonable and prudent people, not legal technicians, act.'" *Id.* at 338 (internal quotations and citations omitted).

Chief Binker clearly expressed the intention to retain possession of the phone once Defendant arrived at the police station. At the Evidentiary Hearing, he explained his reasons for doing so. When asked why he did not return Defendant's cell phone when Defendant was released from police custody, Chief Binker testified, "[h]e didn't ask for it, and I was keeping it as evidence." (*Id.* at 45). While the fact that Defendant did not ask for the return of his phone is of no legal consequence in the seizure inquiry, Chief Binker's more specific responses related to why he kept the phone are relevant. Chief Binker said that he was keeping the phone as evidence (Doc. 34 at 45) and testified that he thought it was important for evidentiary purposes because

> knowing what I know . . . about cell phones. They could be used in a commission of a crime where photographs, due their conversations he might have reached unite [sic] to somebody on that cell phone, and from what we learned from that 911 call that the cell phone was a key part of this. Although we didn't file charges that day, I was advised after the interview with our victim there would be charges filed promptly.

(*Id.* at 46). Chief Binker was later asked if he was aware of the circumstances of the phone's seizure or if Defendant had said anything about the phone and he answered that was merely handed to him by Sergeant Blaski and he then turned it over to Detective Lewis. (*Id.* at 49.) Chief Binker added that he came to the decision by himself to hold the phone as evidence based on

23

being a police officer for 25 years knowing that a 40-some-year-old male was
in a hotel room with a 14-year-old-girl I can – she's claiming she had relations
with the gentleman, at that point I can conclude that there will be charges filed
because anybody over 18 shouldn't have sex with a minor.

(*Id.* at 49).  When asked to confirm that he had "no specific information about the cell

phone's involvement in this," (*id.*), Chief Binker responded:

I know from my training that cell phones, you have text messages, phone
conversations, G.P.S. locations, and I know that some people that's all they
communicate on to – I still have a house phone.  Maybe Mr. Watson didn't.  So
a cell phone could be destroyed very easily if it was returned to him.

(*Id.*)

First, regarding whether probable cause supported Chief Binker's decision to retain

possession of Defendant's phone, the following facts support a finding of probable cause:

the 911 dispatch indicated that Plaintiff had been taken to multiple locations, (Doc. 34 at 42;

Gov't Hr'g Ex. B); Chief Binker knew that cell phones contain G.P.S. locations (Doc. 34 at

49); his assessment that the  911 dispatch indicated that "the cell phone was a key part of

this" logically related to the potential that the phone's G.P.S. data  could establish the

suspect's whereabouts in relation to the locations identified by the alleged victim;

Defendant's possession of the cell phone at the time of his apprehension approximately an

hour and a half after when the 911 call came in indicated that the phone's data would be

applicable to the relevant time period; Chief Binker had met the alleged victim before

retaining possession of the cell phone so had the opportunity to make an initial assessment

of her credibility; and Chief Binker had been informed by the D.A. that charges would be

filed after the alleged victim was interviewed at the Luzerne County Children's Advocacy

Center.  These facts show that the cell phone need not have been specifically mentioned in the 911 dispatch or by the alleged victim to establish that probable cause existed for Chief Binker to believe that the cell phone held evidence of a crime.

Second, Chief Binker had good reason to fear that, if he did not keep the cell phone, Defendant could easily destroy evidence contained in it.  (Doc. 34 at 49.)   *Burton* found that the officer who had interviewed the defendant when he was a suspect "had good reason to fear that [the suspect] would destroy digital evidence if allowed to depart the police station with the phones" when he knew he was the subject of an investigation.  756 F. App'x at 299 (citing *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir. 2001) (fact that suspect is aware that the police are on his trail supports an exigent circumstances finding)).  Here, Defendant had been interviewed about the alleged victim's allegations of kidnapping, rape, and sexual assault in numerous locations, and he knew that he had been apprehended pursuant to a 911 dispatch broadcasting his physical appearance, identity, and details about his vehicle. (*See* Def. Hr'g Exs. 108, 109.)  Therefore, as in *Burton*, Chief Binker reasonably believed that Defendant could destroy the phone or evidence therein related to the allegations against him when he left the police station.

Third, balancing law enforcement needs with Defendant's Fourth Amendment rights, as in *McArthur*, 531 U.S. at 334, the police did not conduct any search or seek to arrest Defendant until after the search of the phone was completed (Criminal Complaint filed on October 28, 2021, *see supra* p. 11 n.3).

Finally, as to whether "the time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant," 531 U.S. at 332, the Search Warrant was applied for and obtained on October 26, 2021, i.e., just one day after the interview. *Burton* held that the two-day delay between the warrantless seizure and the issuance of the warrant was reasonable and was far shorter than longer delays which had been deemed reasonable. 756 F. App'x at 300 (listing cases). Here, the fact that the alleged victim's interview was conducted at the Luzerne County Children's Advocacy Center bolsters the conclusion that the one-day delay in this case was no longer than reasonably necessary.

The foregoing analysis indicates that Chief Binker's retention of the seized phone was supported by probable cause and exigent circumstances. Therefore, the seizure of Defendant's phone did not violate his Fourth Amendment right to be free from unreasonable seizures and suppression of evidence found therein is not warranted based on the seizure.[13]

## B. Search Warrant Scope

In his supporting brief, Defendant contends that the Court should suppress the fruits of the search of the cell phone because the warrant to search the phone "was general, or at

---

[13] Though not raised by the Government in the context of the seizure of the phone, the court notes that, if the seizure were deemed to violate the Fourth Amendment, suppression of the evidence derived from the phone would not be warranted because the facts of record readily support a finding that the good faith exception to the exclusionary rule would be available and the exclusionary rule would not apply because no evidence suggests that officers did not act "upon an objectively reasonable good faith belief in the legality of their conduct." *United States v. Katzin*, 769 F.3d 163, 182 (3d Cir. 2014). The good faith exception will be discussed in detail later in the text.

least overbroad in relation to the scope of the officers' probable cause." (Doc. 25 at 11.)

The Court concludes that suppression of evidence derived from the search of Defendant's

cell phone is not warranted.

Pursuant to the Fourth Amendment, a search warrant is valid if it meets four

requirements: 1) it is based on probable cause; 2) it is supported by a sworn affidavit; 3) it

describes the place to be searched with particularity; and 4) and it describes the persons or

things to be seized with particularity. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

Defendant concedes that the application for the warrant "arguably established

probable cause to believe that the officers would find incriminating contacts, GPS use, and

Instagram use in the areas that store such items on phones—evidence of the crime Mr.

Watson was then suspected of having committed from October 22 – 25, 2022, Statutory

Sexual Assault under 18 Pa. C.S. § 3122.1." (Doc. 25 at 1.) However, Defendant goes on

to argue that the warrant was flawed because it "authorized an unlimited, comprehensive

exploratory rummaging through the phone's contents, a search that had no reasonable

relationship to the places where officers had probable cause to believe evidence would be

found, or the things officers had probable cause to believe they would find." (*Id.* at 1-2.)

> The Fourth Amendment prohibits "[g]eneral warrants" that would allow
> "exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427
> U.S. 463, 479, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (quoting *Coolidge v. New
> Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). To
> guard against such general warrants, courts require "particularity," which
> "prevents the seizure of one thing under a warrant describing another." *Marron
> v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).
> Particularity has three components: "First, a warrant must identify the specific

offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citations omitted).

*United States v. Perez*, 712 F. App'x 136, 138–39 (3d Cir. 2017).

The specific offense identified in the Search Warrant application is Statutory Sexual

Assault, PA 3122.1. (Application for Search Warrant and Authorization at 1, Doc. 24-4.)

Defendant's cell phone is identified as the premises to be searched.  (*Id.*)  The items to be

searched for and seized are identified as follows:

> 1. Any telephone numbers, contact lists, friend lists, messages (verbal or text) including content and all information related to and/or contained within the devices' memory, including contact lists, recently placed or received telephone calls, chats and text messages (present and deleted) and any other part of the electronic memory of the devices.

> 2. Any and all contents contained within the device's internal storage or connected memory card (SD Card), information contained in other memory or storage locations within the device, photographs, any other electronic communications, installed programs/applications and their data and location information. This includes applications on the device that utilize GPS and mapping data.

> 3. All user generated data stored on the handset, SIM card, and/or Micros SD card including user information, application information and data, image files, video files, websites visited, searched items, all call logs (incoming, outgoing, and missed), contact lists and/or phonebooks, Short Message all Services/Text Messages (SMS), Multimedia Messaging Services (MMS).

(*Id.* at 1, 5.)

It is widely recognized that courts "have struggled to adapt Fourth Amendment

search doctrines designed for physical spaces to digital contexts."  *Perez*, 712 F. App'x at

139 (citing *Riley v. California*, 573 U.S. 373, 400 (2014)).  Broad searches of data on cell

phones and computers have been held not to violate the Fourth Amendment's particularity

requirement "because criminals can—and often do—hide, mislabel, or manipulate files to

conceal criminal activity, a broad, expansive search of the hard drive may be required."

*United States v. Stabile*, 633 F.3d 219, 237 (3d Cir. 2011) (citations omitted); *United States*

*v. Reese*,  No. 2:19-cr-257-NR, 2021 WL 4429429, at *4 (W.D. Pa. Sept. 27, 2021).  Relying

on the rationale set out in *Stabile*, the Sixth Circuit stated that federal courts "have rejected

most particularity challenges to warrants authorizing the seizure and search of entire

personal or business computers."  *United States v. Richards*, 659 F.3d 527, 539 (6th Cir.

2011) (citing *Stabile*, 633 F.3d at 237).  *Reese* noted that "[c]ourts are also mindful when it

comes to electronic data, it is often impossible for law enforcement, beforehand, to detail

precisely what will be found, and its location within the electronic device."  *Id.*  (citing *United*

*States v. Bishop*, 910 F.3d 335, 337-38 (7th Cir. 2018))

 *United States v. Vetri*, 811 F. App'x 79 (3d Cir. 2020), addressed a situation where

the warrant authorized the seizure of evidence in electronic equipment but not specifically a

cell phone and the defendant argued that an incriminating video found on his cell phone

should have been suppressed because the search warrant was overbroad.  The Third

Circuit panel concluded that the defendant's cell phone was properly seized and searched

and suppression of the video was not warranted.  *Id.* at 82.  Importantly for the

circumstances presented in this case, *Vetri* recognized that *Stabile* authorized "a cursory review of all electronic files." *Id.*

Defendant's reliance on *Burns v. United States*, 235 A.3d 758, 767 (D.C. 2020), in support of his suppression argument is misplaced. (*See* Docs. 25 at 9-10 & nn. 3-5; Doc. 31 at 6 n.3, 7 n.4.)  *Burns*, a case where the defendant was charged with murder, was discussed in *United States v. Smith*, Crim. Action No. 19-423 (BAH), 2021 WL 2982144 (D.D.C. July 15, 2021), where the defendant was charged with child sexual abuse, production and possession of child pornography, and enticing a minor.  Upholding the search of the entire cell phone, *Smith* noted that the "nature of the offense here, First Degree Child Sexual Abuse, sufficiently limited the scope of the search" and "[t]he affidavit provided ample reason to believe that evidence of the sexual abuse offense existed on the defendant's electronic devices, but law enforcement could not know for certain on which or where on the devices the evidence would be found." *Id.* at *9.  In response to the defendant's challenge that the warrant was overbroad and insufficiently particular, *Smith* stated that the defendant's reliance on *Burns* and other non-federal cases were "nonbinding and unavailing," *id.* at *10:

> defendant relies on *Burns v. United States*, 235 A.3d 758 (D.C. 2020), for the proposition that the warrant "must specify the particular items of evidence to be searched for and seized from the phone and be strictly limited to the time period and information or other data for which probable cause had been properly established . . . ." Def's Mot. At 5 quoting *Burns*, 235 A.3d at 773.) Not only is this understanding of the warrant requirement nonbinding on this Court and contrary to substantial federal caselaw, *see e.g.*, [*United States v. Bishop*, 910 F.3d  335, 337 (7th Cir. 2018)]; [*United States v. Castro*, 881 F.3d

961, 965 (6th Cir. 2018)], but *Burns* articulated this proposition without citation to any authority beyond *Riley*. As described above, *Riley* addressed only warrantless searches and said nothing about the appropriate scope of the search of a cell phone pursuant to a warrant.

Moreover, *Burns* is distinguishable on its facts. In that case, the court concluded that the warrant authorizing the government to search the defendant's phones for "evidence" of the relevant murder was insufficiently particular because the affidavit only established that one of defendant's phones would contain three pieces of evidence relating to the murder: text messages, records of a phone call, and GPS data showing the location of the phone on the night of the murder. *Id.* at 777. There was no reason to believe that evidence tying the defendant to the murder would be pervasive throughout the phones, and the defendant in that case was not even a suspect at the time his phones were searched, "ma[king] the existence of any nexus between the great majority of the data on the phones and the crime under investigation even more unlikely." *Id.* at 779. **Broad offense-based searches may be excessive in murder investigations in which the cell phone is not used in carrying out the offense, but well-within Fourth Amendment bounds in the case of child sexual abuse, where the cell phone may be integral to the offense and the kinds of evidence and contraband likely to be stored on the phone are varied and well-known to law enforcement.** *See* [*United States v. Burke*, 633 F.3d 984, 992 (10th Cir. 2011)].

*Smith*, 2021 WL 2982144, at *10 (emphasis added).

Because the crime identified in the Search Warrant application is Statutory Sexual Assault and the Affidavit indicated that the cell phone had been used multiple times to contact multiple people during the victim's confinement (Application for Search Warrant and Authorization at 1-3, Doc. 24-4), by logical extension, information about those people and the verification of their identity could have been found in multiple locations on the cell phone. As recognized in *Smith*, based on the type of crime committed here, the bounds of the usage of the cell phone in the alleged offense are known to be "varied and well-known

to law enforcement."[14]  2021 WL 2982144, at *10.  Thus, a broad search of the seized cell

phone was acceptable in the circumstances presented, and suppression of evidence

derived from the approved search will not be suppressed.

Alternatively, the Government argues that if the Search Warrant were deemed

defective, the evidence is admissible under the good faith exception to the exclusionary

rule.  The Court agrees.

As set out previously, *see supra* p. 14, under the exclusionary rule "evidence

obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding

against the victim of the illegal search and seizure."  *United States v. Calandra,* 414 U.S.

338, 347,(1974).  In *Leon*, the Court considered the question of whether "the Fourth

Amendment exclusionary rule should be modified so as not to bar the admission of

evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently

held to be defective."  *Id*. at 905.  In answer to the question, the Court stated:

> We conclude that the marginal or nonexistent benefits produced by
> suppressing evidence obtained in objectively reasonable reliance on a
> subsequently invalidated search warrant cannot justify the substantial costs of
> exclusion. We do not suggest, however, that exclusion is always inappropriate
> in cases where an officer has obtained a warrant and abided by its terms.
> "[S]earches pursuant to a warrant will rarely require any deep inquiry into
> reasonableness," *Illinois v. Gates*, 462 U.S., at 267, 103 S.Ct., at 2347 (WHITE,
> J., concurring in judgment), for "a warrant issued by a magistrate normally
> suffices to establish" that a law enforcement officer has "acted in good faith in

---

[14] As set out above, other than the initial cursory interview at the motel  with a very distraught
fourteen-year-old girl, the interview of the alleged victim was conducted by the Luzerne County Children's
Advocacy Center.  Therefore, the investigating officers were not in control of the information gained from
the interview and more fulsome questioning which may have provided additional details pertinent to the use
of the cell phone was not available.

conducting the search." *United States v. Ross*, 456 U.S. 798, 823, n. 32, 102 S.Ct. 2157, 2172, n. 32, 72 L.Ed.2d 572 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2737–2739, 73 L.Ed.2d 396 (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S., at 610–611, 95 S.Ct., at 2265–2266 (POWELL, J., concurring in part); *see Illinois v. Gates*, supra, 462 U.S., at 263–264, 103 S.Ct., at 2345–2346 (WHITE, J., concurring in the judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts v. Sheppard*, 468 U.S., at 988–991, 104 S.Ct., at 3428–3430.

Leon, 468 U.S. at 922–23.

First, there is no allegation that the issuing magistrate was misled by information that the affiant knew was false or should have known was false pursuant to *Franks*.  Second, there is no allegation that the issuing magistrate totally abandoned his judicial role in the manner condemned in *Lo-Ji Sales* where the issuing Town Justice allowed himself to become a member of the search party executing the warrant and made on-site

determinations as to the propriety of seizures while also leaving such decisions up to the discretion of officers present.  442 U.S. at 326-27.

Defendant focuses his argument that suppression is warranted based on the remaining bases identified in *Leon*:  the officer relied on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," 468 U.S. at 923 (quoting *Brown*, 422 U.S. at 610–11), and the warrant was so facially deficient in failing to particularize the place to be searched or the things to be seized that Detective Lewis could not reasonably presume it to be valid, *id.* (citing *Sheppard*, 468 U.S. at 988–91).  (*See* Doc. 31 at 9-10.)  Again relying on *Burns*, Defendant criticizes the affidavit for being "bare bones" and the enumeration of things to be seized appears to be a template such that any reasonably well-trained officer would have known the warrant was invalid.  (*Id.* & n.5 (citing *Burns*, 235 A.3d at 767, 779).)  For the reasons discussed above, Defendant's reliance on *Burns* is unavailing.  Further, based on the widely recognized allowance of more generalized searches and cursory review of electronic files discussed above, *see supra* pp. 29-32, if the warrant were deemed defective based on a lack of particularity, it would not mean that it would be deficient to the degree that the executing officer could not rely on it.

Finally, the balancing test used in the application of the exclusionary rule and consistently considered by the Supreme Court, *see supra* pp. 14-15 & n.4, counsels against exclusion in this case.  As set out previously in the margin, *see supra* p. 15 n.4, the good

faith exception to the exclusionary rule was developed to effectuate the balance of the

deterrent value of suppression and the resulting social costs. *See, e.g., United States v.*

*Katzin*, 769 F.3d 163, 171 (3d Cir. 2014). Here, the deterrent value of suppression is

minimal. Assuming *arguendo* that the officer's conduct violated the Fourth Amendment, the

foregoing discussion indicates that a reasonably well-trained officer would not have known

that his conduct was illegal in the circumstances presented here. The social costs of

exclusion in this case are great. As noted in *Davis v. United States*, 564 U.S. 220 (2011),

> [e]xclusion exacts a heavy toll on both the judicial system and society at large
> [because] [i]t almost always requires courts to ignore reliable, trustworthy
> evidence bearing on guilt or innocence. . . . And its bottom-line effect, in many
> cases, is to suppress the truth and set the criminal loose in the community
> without punishment.

564 U.S. at 237 (internal citation omitted). Such is the case here where Defendant allegedly

abducted a fourteen-year-old girl off the street and held her captive for several days, during

which time he repeatedly sexually assaulted her and the videos and photographs found on

his cell phone are reliable evidence supporting the allegations. This evidence derived from

the phone is central to the five counts of sexual exploitation of a minor in violation of 18

U.S.C. § 2251(a) with which Defendant is charged in the Indictment. (*See generally* Doc.

1.) Given the serious nature of Defendant's alleged wrongdoing and the value of the

evidence he seeks to suppress, the Court has no doubt that the requisite balancing weighs

in favor of admission of all evidence derived from the search of Defendant's cell phone.

## IV. CONCLUSION

For reasons set forth above, Defendant Watson's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution (Doc. 24) will be denied such that all primary and derivative evidence obtained from Defendant's cell phone will not be suppressed.   A separate Order will be entered.

_____

Robert D. Mariani
United States District Judge